FILED
2008 Mar-19  PM 12:20
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| **PAULA PATE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **7:06-cv-1310-UWC** |
| **PRISON HEALTH SERVICES,** | ) | |
| **INCORPORATED,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION
## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The present action was initiated by Paula Pate ("Pate"), who is a white female,
against Prison Health Services ("PHS") for alleged discrimination and retaliation based
upon race.  *See* 42 U.S.C. § 1981; 42 U.S.C. § 2000e, *et. seq.*

Presently before the Court is a motion for summary judgment by PHS and a motion
to strike.  (Docs. 16, 33.)  For the reasons set forth below, the Court finds that PHS is
entitled to summary judgment on Plaintiff's retaliation claim, but summary judgment is
due to be denied on Plaintiff's disparate treatment claim, as well as PHS's motion to
strike.

## I. FACTS [1]

PHS provides medical services to inmates incarcerated in thirteen correctional facilities throughout the State of Alabama.  Pate was employed by PHS as a Dental Assistant at the Donaldson Correctional Facility in Bessemer, Alabama ("Donaldson"). At the time of the incidents that gave rise to the instant litigation, PHS's Regional Vice President/Contract Manager for Alabama was Laura Ferrell, a white female.  Ferrell supervised Wendy Smith, who was employed as the Regional Health Services Administrator ("RHSA").  Smith, in turn, supervised Stephanie Lawson, a black female, who was  employed by PHS as the Donaldson Health Services Administrator ("HSA").

As HSA Lawson was the on-site individual responsible for supervising Pate and the other non-physician medical staff with respect to administrative matters. Consequently, in consultation with upper management, Lawson had input into all hiring, disciplinary and termination decisions.  While she had the direct authority to suspend employees, such action should have been "followed up . . . with" human resources. (Def.'s Ex. 4, Ferrell Aff. ¶ 8.)  Finally, Lawson was responsible for processing performance evaluations that were used as a basis for determining Pate's pay raises. Once Lawson received the performance evaluation from Pate's supervising dentist, Lawson could either forward the evaluation without comment to Human Resources ("HR") or provide input prior to forwarding to HR.

---

[1] On a motion for summary judgment, the Court must view all the facts in the light most favorable to the non-movant. *DeJulio v. Georgia*, 276 F.3d 1244, 1258 (11th Cir. 2001).

With respect to the clinical/medical aspects of Pate's job, she was supervised by several physicians.  For most of the time at issue here, Dr. Briscoe was the dentist on staff who directly supervised Pate.  At some point, however, he was replaced by another dentist, Dr. Helen Bloom-Smith.  As Pate's immediate supervisor and the person most familiar with her day-to-day work performance, the staff dentist was responsible for completing Pate's performance evaluations.

The dentists reported to Medical Director Clyde Varner, M.D., a black male, who was responsible for the on-site clinical supervision of all physicians, nurses and other medical staff, including Pate.  Given this supervisory capacity, Dr. Varner could provide input into performance evaluations.  Additionally, although Lawson was responsible for carrying out disciplinary actions, such as suspensions, Dr. Varner could provide input into such actions.

Pate's claims primarily center around an unpaid three day suspension and a 2.5% pay raise, which was less than Pate believed she was entitled to receive.

Lawson was hired in April 2004 and the following month a meeting was held to address alleged racial discrimination by Lawson.  (Def.'s Ex. 1, Pate Dep. at 95-96.)  On several occasions, including during this May meeting, Pate claims to have heard Dr. Varner discuss a comment Lawson purportedly made.  (Pate Dep. at 92-95.)  According to Pate, Dr. Varner said Lawson had told Varner that they needed to get "them out of here and bring in our people."  (Pate Dep. at 92.)  Dr. Varner also called Lawson a racist and

said she was trying run all the whites off.  (Pate Dep. at 99, 158, 169.)  Lawson was not present at this meeting.

Approximately two weeks later, the first significant incident directly involving Pate and Lawson occurred.  While Pate was having lunch with some of her co-workers, Lawson questioned Pate about certain inmate scheduling concerns and asked Pate if "we had faxed the list . . . or did we just say to hell with it."  (Pate Dep. at 55.)  Lawson also indicated she was stripping Pate of some of her duties.  Pate was disturbed by the fashion in which Lawson handled the matter and, shortly thereafter, drafted a complaint in which she described Lawson's conduct as "out of line and unacceptable on a professional level." (Def.'s Ex. 1(E).)  Pate sent a copy of the complaint to Smith (Regional Health Services Administrator), Ferrell (Regional Vice-President), Dr. Briscoe (Pate's supervising dentist), and Dr. Mosier, an administrator in a supervisory capacity above Medical Director Dr. Varner.  Nowhere in the complaint does Pate raise the issue of race or discrimination.

Lawson was out of town when Pate distributed the letter.  Immediately upon Lawson's return, around May 26, the "bumping" incident occurred.  Pate was coming out of the infirmary entering a hallway when Lawson came across from the other side of the hallway, then used her shoulder and elbow to bump into Pate with such force that Lawson momentarily lost her balance, but did not fall.  (Pate Dep. at 66.)  Lawson said "oh, excuse me" and proceeded into the infirmary.  (*Id*. at 68.)  Pate testified that the hallway

was wide enough to allow Lawson sufficient room to negotiate without touching Pate.

Pate believes this incident occurred out of retaliation over the complaint letter she wrote about the lunchtime incident.  Although Pate believes Smith showed Lawson the letter, there is no evidence in the record that Lawson had seen or been made aware of the letter at the time of the bumping incident.

The same day as the bumping incident, Pate reported the incident to Dr. Briscoe, as well as to the assistant warden, who is black.  In her conversation with the assistant warden, Pate explained that Lawson had been "doing this" to the white employees.  Pate further explained that she believed the hallway incident was "racial" in nature and constituted a "hostile work environment."  (Pate Dep. at 71.)  Later that same day, a Wednesday, Pate also talked to the Warden.  PHS Vice-President Ferrell participated in the meeting via telephone, during which time Pate admitted that she had not been hurt or bruised.  Ferrell put Pate on paid administrative leave pending investigation of the matter and scheduled a staff meeting for June 1, the next business day.[2]

After that hallway incident, Pate drafted a second letter in which she described Lawson's conduct as "childish and petty."  (*Id.*)  However, Pate never raised the issue of race or discrimination.

During the investigation of the incident, Lawson claimed the bumping incident was an accident and promised to apologize.  Although an inmate had witnessed the event,

---

[2]  It is unclear from the record whether the staff meeting had already been scheduled prior to Pate's complaint about Lawson.

there is no evidence Ferrell sought to determine the inmate's identity or obtain a witness statement.  Apparently nothing was placed in Lawson's file about the matter and Pate testified that Lawson never apologized   For these reasons, Pate is of the opinion that Ferrell's investigation was not sufficiently thorough.

At the June 1 meeting, Ferrell and Dr. Varner had a heated discussion about Lawson.  Pate's aunt, Roberta Godfrey, was employed at PHS and remembers Dr. Varner complained during the meeting that Lawson (who is also a nurse) was going against his wishes, both administratively and clinically.  (Doc. 19, Pl.'s Ex. 7, Godfrey Dep. at 112-13.)  In the context of this discussion about Lawson, Dr. Varner produced some printed material about how to handle a "bully boss."  (*Id*.)  At some point, Godfrey repeated the get "them out of here and bring in our people" comment that she had heard Dr. Varner discuss.  (*Id*.)  Lawson was present at the meeting, but did not speak.  According to Pate, ultimately Ferrell verbally reprimanded the employees for complaining about Lawson. (Pate Dep. at 92-93; 100-1)

Pate claims that Ferrell later instructed Pate to keep her mouth shut, do her job and get along with Lawson or Ferrell would have Pate transferred to another facility.

On a Monday later in June, Pate's check was short and she discussed the matter with Lawson, who instructed Pate to complete the appropriate paperwork.[3]  Pate completed the paperwork and returned it to Lawson that same day, Monday.  On Tuesday,

---

[3]  Pate testified that this paycheck problem was an administrative payroll error, rather than the result of discrimination.  (Pate Dep. at 145, 148.)

Pate followed up with Lawson and was instructed to complete additional paperwork, which Pate did the same day.  By Friday, Pate asked Lawson about the payroll problem and Lawson responded "well Ms. Pate do you think I'm trying to keep your pay from you."  (Pate Dep. at 108.)  Pate responded "yes," and asked to meet with Lawson to discuss the payroll matter.

Later that afternoon, the two women met with Dr. Briscoe in attendance.  Lawson handed Pate two disciplinary forms and asked Pate to sign them, without explaining their contents.  Pate never looked at the documents and instead asked for verification that Lawson had faxed the payroll documents.  Upon inspection of the fax sheet, Pate discovered that Lawson had waited until Thursday afternoon to send the fax, even though she had received all the necessary documents that prior Tuesday.  Pate went to make a photocopy of the fax sheet, but Lawson told Pate not to do so and to give the fax sheet back to Lawson.  Pate made the copies and then returned the fax sheet to Lawson, who informed Dr. Briscoe that he needed to "do something with" Pate.  (Pate Dep. at 133.)  Pate replied that she was just trying to "get her pay," at which point Lawson suspended Pate  "until further notice."  (Pate Dep. at 134.)

During the suspension, Pate telephoned PHS's toll free hotline and complained that she had been terminated for purported insubordination.  (Def.'s Ex. 2(F).)  Pate also complained of "hostility in the work environment," but she did not mention race or discrimination.  (*Id*.)

Despite the purported wide-spread belief that Lawson was racist, Pate testified that she and other white employees were careful about raising the race issue for fear of being called racist themselves.  (Pate Dep. at 169, 172.)

HR employee Sheila Morris contacted Pate about the hotline call and told her to return to work, which she did.  Ultimately, the June payroll error was corrected. However, Pate was never compensated for the three day suspension that occurred as a result of the fax sheet incident.  (Pate Dep. at 174.)

Pate's employment file contains no documentation regarding the unexplained disciplinary forms Lawson asked Pate to sign.  With respect to the unpaid three-day suspension, Morris remembers discussing the matter with Lawson, but does not recall any particulars.  However, during her deposition, Morris confirmed PHS has a policy of documenting suspensions.  She always tells employees to document and she would have directed Lawson to complete such documentation.  (Def.'s Ex. 3, Morris Dep. at 18-19.) However, Pate's employment file contained no documentation regarding the suspension, as well as no documentation regarding any performance issues.  (Def.'s Ex. 3(C); Def.'s Ex. 3, Morris Dep. at 21.)

Around December 12, Dr. Bloom-Smith completed Pate's performance evaluation and recommended that she receive a 3% raise.  However, Pate did not receive a 3% raise. Instead, she received at 2.5% raise after Lawson rated Pate lower than Dr. Bloom-Smith's

ratings in all categories and recommended the lower amount.  (Def.'s Ex. 1(G).) [4]

For reasons unrelated to the Pate incidents, Lawson was terminated less than one

year after becoming HSA.  Apparently, sometime later another company took over the

dental services at Donaldson and Pate was ultimately terminated.[5]

## II. ANALYSIS

### A. Disparate Treatment

Pate complains that Lawson engaged in discriminatory conduct when she

suspended Pate for three days without pay.[6]  Pate may establish a prima facie case of

discrimination using statistical proof of a pattern of discrimination, using direct evidence

of discrimination, or using "circumstantial evidence to prove discriminatory intent, using

---

[4]  PHS asks this Court to strike the portions of Plaintiff's summary judgment response that relate to the performance evaluation because Plaintiff did not raise the performance evaluation in her EEOC charge.  Implicit in this motion is the notion that PHS had no notice that Plaintiff sought to recover for the challenged conduct.

PHS's motion is due to be denied.  Although the complaint and EEOC charge do not specifically mention the pay raise issue, in both documents Plaintiff contends that she was "continually harassed" by Lawson.  More importantly, during Plaintiff's deposition, counsel for both parties questioned Plaintiff about the pay raise issue.  Plaintiff testified that she believed the 2.5% pay raise was "unfair" and retaliatory.  (Pate Dep. at 162, 168.)  Accordingly, PHS was not prejudiced by this evidence.

[5]  The new medical services provider is not a defendant in this action and Pate has not asserted termination claims in this action.

[6]  Pate complains of other unspecified "harassment" by Lawson and her general treatment of blacks more favorably than whites.  There is nothing in the record, however, to support a cause of action for this unspecified conduct.  Nor is there sufficient evidence of severe and pervasive conduct sufficient to support a hostile environment claim.

the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824- 25, 36 L.Ed.2d 668 (1973)."  *Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997).

### 1. Direct Evidence

Pate contends that Lawson's comment about getting "them out of here and bring[ing] in our people" constitutes direct evidence of discrimination.[7]  "Direct evidence is not inferential; it is "evidence which if believed, proves the existence of fact[s] in issue without any inference or presumption.'" *Hinson v. Clinch County, Georgia Bd. Of Educ.*, 231 F.3d 821, 827 (11th  Cir. 2000) (citation omitted).  Given this definition and its strict application by the Eleventh Circuit Court of Appeals, Lawson's comment does not constitute direct evidence; some level of "inference or presumption" would be necessary for a jury to conclude Lawson acted with racially discriminatory intent.  *See Hinson*, 232 F.3d at 827.  Additionally, inasmuch as Pate was not terminated, she has no evidence that the comment related directly to the challenged employment decisions, as required by the Eleventh Circuit in direct evidence cases.  *See Rojas v. Florida*, 285 F.3d 1339, 1342-43 (11th Cir. 2002).

While Lawson's statement does not constitute direct evidence in this Circuit, the Court notes that Lawson's statement may create "<u>significant</u> evidence of pretext."  *See*

---

[7] Lawson was ultimately terminated and never deposed in this action.  Apparently, Dr. Varner resigned prior to Lawson's termination and was never deposed.

*Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998) (emphasis in original) (noting that "language not amounting to direct evidence, but showing some racial animus, may be significant evidence of pretext once a plaintiff has set out a prima facie case") (emphasis in original) (citations omitted); *Rojas v. Florida*, 285 F.3d at 1342-43 (noting that "isolated" comments "unrelated to the challenged employment decision . . . can <u>contribute</u> to a circumstantial case for pretext.") (emphasis in orginal).

However, in order for this Court to consider the comment as a part of the pretext analysis, Pate must first overcome PHS's evidentiary objection.  Specifically, PHS argues that the statement attributed to Lawson is inadmissable hearsay.

> Under the Federal Rules of Evidence, "hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).  As a general rule, "hearsay is not admissible except as provided by these rules." Fed. R. Evid. 802.  Excepted from the definition of hearsay, however is "a statement by the party's agent or servant concerning a matter <u>within the scope of the agency or employment</u>, made during the existence of the relationship," which is deemed an admission by a party opponent."  *See* Fed. R. Evid. 801(d)(2)(D).  Thus, <u>statements made by a supervisory official who plays some role in the decision making process are generally admissible</u>.

*Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1456 (11th Cir. 1997) (emphasis added) (some citations omitted).  Because neither Lawson or Dr. Varner had the authority to hire or fire Pate, PHS first argues that the comments made by Lawson and repeated by Dr. Varner were not made "within the scope of the agency or employment."

*See* Fed. R. Evid. 801(d)(2)(D).

This argument fails because this is not a direct evidence case; in such cases, the law requires that the comment be directly related to the type of employment action at issue.  When the comment is introduced in a pretext case, as involved here, it is sufficient for purposes of the hearsay exception that the supervisor making the comment had input into or authority to carry out the challenged employment action.  In other words, the comments must have been made "within the ordinary scope of [the supervisor's] duties." *See Zaben v. Air Products & Chemicals, Inc.*, 120 F.3d 1453, 1456 (11th Cir. 1997). There is no question that both Lawson and Varner had input and/or authority to carry out suspensions.  Thus, the comments fall within an exception to the hearsay rule as a admission by a party opponent.

PHS also challenges Dr. Varner's repetition of Lawson's comment because neither Dr. Varner or any other person who actually heard Lawson make the comment has provided testimony in this action.  Rather, Pate and Godfrey testified that they overheard Dr. Varner repeat Lawson's comment.

As the Eleventh Circuit has explained, "hearsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule . . . ." *Zaben*, 120 F.3d at 1456 (citations omitted).  As noted above, both Lawson's comment and Dr. Varner's repetition of the comment fall within an exception to the hearsay rule.  Thus, the absence of a witness who actually

overheard Lawson is not fatal to Plaintiff's case.

Indeed, in a recent employment termination case, the Eleventh Circuit specifically allowed into evidence testimony by two non-supervisory employees who overheard a supervisor named Cheek repeat discriminatory comments made by Valderrama, the decision maker. *Horne v. Turner Construction Company*, 136 Fed. Appx. 289, 292 (11th Cir. 2005). Contrary to the position taken by PHS in its brief, there is nothing in the Eleventh Circuit decision that would indicate Cheek actually testified (either during discovery or at trial) as to the discriminatory statements he overheard Valderrama make. Instead, the Court notes that Cheek testified about certain employment practices in support of his employer, the defendant. *Id*. at 291. Obviously, the defendant did not object to such testimony. Rather, the defendant objected to the testimony of Horne (the Plaintiff) and another non-supervisory employee, Daniels, about Cheek's repetition of the decision maker's discriminatory comments. *Id*. at 292. The testimony was admitted by the Eleventh Circuit over defendant's objections because "both levels of statements fall within the hearsay exclusion for statements" made by a party opponent within "the scope of their authority." *Id*. (noting that "Valderrama's statements to Cheek and Cheek's subsequent statement to [non-supervisory employees] Horne and Daniels" were admissible.) Accordingly, the Court finds that Lawson's purported comment about getting "them out of here and bring[ing] in our people" is admissible.

## 2. Circumstantial Evidence

Next, PHS argues Pate has no evidence that PHS's legitimate non-discriminatory reason for her suspension, insubordination, was pretextual.  The Court disagrees.  First, the evidence establishes that Lawson did not follow PHS procedures as they relate to imposing the suspension.  Lawson had the authority to suspend Pate, but Lawson was obligated to "follow-up" with HR.  However, there is no record she did so.  Rather, HR became involved after Pate telephoned the complaint hotline.  Moreover, HR representative Morris testified that she would have directed Lawson to document the suspension, but there is no record of the suspension in Lawson's file.  "[A]n employer's deviation from its own standard procedures may serve as evidence of pretext."  *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1229 (11th Cir. 2006).

In addition to Lawson's failure to follow PHS procedures, there is evidence of arguably discriminatory statements by Lawson.  Not only is there evidence that Lawson made the "bring[ing] in our people" statement, but there is also testimony about another statement.  Godfrey testified that she overheard Lawson and Regional Health Services Administrator Smith, who is also black, "giggling and talking about . . . it was too bright in there and they needed to add some color."  (Pl.s' Ex. 7, Godfrey Dep. at 77-76.)

A reasonable fact finder could determine that Lawson's three day suspension of Pate was tainted by racial animus where: (1) Pate was suspended after making a copy of a document relating to her own personnel records; (2) the employer has no documentation

to substantiate the reason for the suspension; (3) the absence of documentation is inconsistent with corporate policy; (4) the decision maker made statements that are arguably discriminatory.  Indeed, even if Pate's conduct did indeed constitute insubordination, the evidence taken in totality could support a finding that Lawson was at least partially motivated by discriminatory animus.  *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-45, (1989) (allowing Plaintiff to proceed on a "mixed motive" theory).

## B. Retaliation

Pate contends that Lawson engaged in retaliatory conduct by bumping into Pate in the hallway, suspending her and giving her a pay raise at a rate less than deserved.  The problem with this argument is that Pate has no evidence that Lawson was aware of any discrimination complaints made by Pate.  In none of Pate's written complaints, nor in her call to the hotline, does Pate mention race or discrimination.  While Pate mentioned racial discrimination and hostile work environment in her meeting with the assistant warden and/or warden, again, there is no evidence that Lawson was aware of such complaints. *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) (noting that a retaliation claim cannot go forward unless the decision maker was aware of the protected activity).  Accordingly, Plaintiff's retaliation claims shall be dismissed. [8]

---

[8]  The Court notes that even if Lawson's bumping of Pate was retaliatory, such conduct supports a tort claim, not a viable employment discrimination claim.

### III. CONCLUSION

For the reasons enunciated above, PHS's motion to strike is due to be denied and its summary judgment motion is due to be denied with respect to Plaintiff's disparate treatment claim.  However, summary judgment will be granted on Plaintiff's retaliation claim.

The Court will enter an order embodying these conclusions and granting the appropriate relief.

Done this 18th day of March, 2008.

_____
U.W. Clemon
United States District Judge